**THIS ORDER IS SIGNED AND ENTERED.**

**Dated: April 23, 2026**



*Rachel Blise*

**Hon. Rachel M. Blise**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

Christopher E. Maeder,

Debtor.

Case No. 25-11928-rmb

Chapter 13

---

### AMENDED DECISION AND ORDER GRANTING
### MOTIONS TO CONVERT OR DISMISS FILED BY
### ETERNIX LTD. AND THE UNITED STATES TRUSTEE

---

Debtor Christopher E. Maeder filed this chapter 13 case for the purpose of avoiding repayment of a debt owed to a single creditor, Eternix Ltd., for copyright infringement.  Maeder engaged in significant pre-bankruptcy planning that left him with few non-exempt assets and Eternix as the only creditor affected by the bankruptcy, and Maeder's initial chapter 13 plan proposed to pay Eternix a small fraction of the debt.  Eternix and the United States trustee seek conversion of the case to chapter 7.  Considering the totality of the circumstances, the Court finds that Maeder did not file chapter 13 in good faith and that conversion is appropriate under 11 U.S.C. § 1307(c).

1

## BACKGROUND

Maeder is the sole owner of a company called CivilGEO, Inc.  CivilGEO is in the business of developing and licensing mapping software for use in connection with complex engineering projects.  For example, the company's software allows users to create virtual models to visualize the behavior of stormwater under various scenarios.

On September 14, 2023, Eternix Ltd. filed a complaint against Maeder and CivilGEO in the Western District of Wisconsin, Case No. 3:23-cv-00633-jdp, alleging that much of the software underlying CivilGEO's products was built on or directly replicated Eternix's Blaze Terra software.  According to Eternix, Maeder received a copy of the Blaze Terra software in 2011 for the purpose of evaluating whether a different company Maeder owned wanted to license the software.  Eternix says that Maeder then copied the software to build his own products with the help of engineers in India.  Eternix sought damages against both CivilGEO and Maeder personally for copyright infringement, misappropriation of trade secrets, breach of contract, conversion, and unjust enrichment.

The parties filed cross motions for summary judgment in December 2024.  On April 1, 2025, while the summary judgment motions were still pending, Maeder caused CivilGEO to file a chapter 11 bankruptcy in the Bankruptcy Court for the Western District of Wisconsin, Case No. 3-25-10731-cjf.  By that time, Maeder had already decided to file a personal bankruptcy as well.  As explained in more detail below, Maeder spent the next several months taking steps to shield his assets from creditors.

On April 23, 2025, the district court issued a decision on the pending motions for summary judgment as to Maeder (the motions as to CivilGEO were stayed by the bankruptcy filing). (Ex. 100.) The district court concluded that "Maeder, without authorization, took, copied, and used Eternix's Blaze Terra software code in his products and made, sold, licensed, and distributed products containing that code." (Ex. 100 at 31.) The district court effectively concluded that Maeder is liable for copyright infringement, though many fact questions remain regarding the scope of that liability that the district court determined must be resolved with a trial. (*Id.*)

On August 29, 2025, almost exactly 90 days after he arranged for payment of a large legal bill from the district court litigation, Maeder filed a chapter 13 petition. Eternix is Maeder's only creditor. Eternix claims that Maeder's liability is almost $110 million. (*See* Claim No. 2.)[1] Maeder's position on the extent of Eternix's claim is unclear. Based on his latest proposed chapter 13 plan, it seems that Maeder agrees Eternix is owed at least several hundred thousand dollars. (*See* Dkt. No. 64.)

On October 29, 2025, Eternix filed a motion to dismiss the case pursuant to 11 U.S.C. § 1307(c), arguing that Maeder did not file his chapter 13 bankruptcy petition in good faith. (Dkt. No. 29.) On December 5, 2025, the United States

---

[1] Only one other creditor filed a proof of claim, U.S. Bank National Association dba Elan Financial Services. (Claim No. 1.) Maeder objected to the claim, arguing that the debt is related to a credit card issued to CivilGEO, and that he has no personal liability for the debt. (Dkt. No. 95.) U.S. Bank did not respond to Maeder's claim objection, and the Court entered an order disallowing the claim. (Dkt. No. 115.)

trustee filed a motion to convert this case to one under chapter 7, or alternatively to dismiss the case, also arguing that Maeder did not file his petition in good faith. (Dkt. No. 58.)

The Court held an evidentiary hearing on the motions on February 13 and 18, 2026.  Based on the evidence presented at the hearing, which is discussed in more detail below, the Court finds that Maeder did not file his chapter 13 petition in good faith.  The evidence shows that rather than filing a chapter 13 petition in a good faith attempt to pay his debts, Maeder engineered this bankruptcy case to be a two-party dispute that would allow Maeder to avoid paying Eternix to the greatest extent possible.  In furtherance of this goal, Maeder took great care to pay all his creditors other than Eternix before filing; he admitted that the only reason for the bankruptcy filing is to avoid the Eternix debt; he engaged in extensive pre-bankruptcy planning in an attempt to shield assets from Eternix, while using those same assets to pay other creditors; he spent money on lavish gifts while planning to file bankruptcy that he did not report on his bankruptcy schedules; he manipulated his bankruptcy schedules and the chapter 13 plan requirements; and he valued CivilGEO at $0 despite repeatedly telling family that the company is worth millions, even after the bankruptcy filing.  Reviewing Maeder's actions together and based on the totality of the circumstances, the Court finds that Maeder did not file chapter 13 in good faith.

## JURISDICTION

The Court has jurisdiction over this chapter 13 case and these contested matters pursuant to 28 U.S.C. § 1334 and the order of reference from the district

court pursuant to 28 U.S.C. § 157(a). *See* General Order No. 161 (W.D. Wis. June 12, 1984) (available at https://www.wiwd.uscourts.gov/administrative-orders) (last visited April 17, 2026). This decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

## DISCUSSION

### I.

Section 1307(c) of the Bankruptcy Code provides that a bankruptcy court "may convert a case under [chapter 13] to a case under chapter 7 of [title 11], or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1307(c). The statute includes a non-exhaustive list of circumstances that might constitute cause for conversion or dismissal. *Id.*

A lack of good faith in filing the petition is not among the list of circumstances in § 1307(c), but the Seventh Circuit has held that a debtor's lack of good faith is sufficient cause for conversion or dismissal. *In re Love*, 957 F.2d 1350, 1354 (7th Cir. 1992) ("This court has indicated that lack of good faith is sufficient cause for dismissal under Chapter 13.") (citing *In re Smith,* 848 F.2d 813, 816, n.3 (7th Cir. 1988)). The movant has the burden to show lack of good faith warranting dismissal or conversion. *Love*, 957 F.2d at 1355 ("[T]he party moving for dismissal must demonstrate cause.").

"Good faith" "is a term incapable of precise definition." *Love*, 957 F.2d at 1355. "[T]he good faith inquiry is a fact intensive determination" made based on

5

reviewing "the totality of [the] circumstances." *Id.*  Bankruptcy courts must "make

good faith determinations on a case-by-case basis." *Id.*[2]  "[T]he focus of the good

faith inquiry under [Section 1307] is often whether the filing is fundamentally fair

to creditors and, more generally, is the filing fundamentally fair in a manner that

complies with the spirit of the Bankruptcy Code's provisions." *Id.* at 1357.  A

bankruptcy court should "examine whether or not under the circumstances of the

case there has been an abuse of the provisions, purpose, or spirit of [chapter 13]."

*Id.* (cleaned up); *see also id.* at 1358-59 ("[T]he good faith standard prevents debtors

from manipulating the Code for wrongful purposes."); *In re McGovern*, 297 B.R. 650,

660 (S.D. Fla. 2003) ("The central and more pertinent inquiry . . . is whether the

debtor came to bankruptcy court seeking a fresh start under Chapter 13 protection

with an intent that is consistent with the spirit and purpose of that law—

rehabilitation through debt repayment—or with an intent contrary to its

purposes—debt avoidance through manipulation of the Code.").

"[T]he good faith inquiry is both subjective and objective." *Love*, 957 F.2d at

1357.  "That is, both objective evidence of a fundamentally unfair result and

subjective evidence that a debtor filed a petition for a fundamentally unfair purpose

that was not in line with the spirit of the Bankruptcy Code are relevant to the good

faith inquiry." *Id.*

---

[2] The Seventh Circuit acknowledged in *Love* that "totality of the circumstances" does not provide a
clear rule or guidance for bankruptcy courts to follow: "Unfortunately, however, we cannot
completely alleviate the confusion and at the same time retain the advantages of the totality of
circumstances test.  This is because as our definition of good faith becomes more precise, the
bankruptcy court has less discretion to weigh the evidence first hand in making good faith
evaluations. In short, the downside of the totality of circumstances test is a degree of uncertainty."
*Love*, 957 F.2d at 1357.

The Seventh Circuit articulated a "nonexhaustive list [that] exemplifies some of the factors that are relevant when determining if a Chapter 13 petition was filed in good faith." *Love*, 957 F.2d at 1357. This list includes: "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors." *Id.*

Considering the totality of the circumstances, the Court concludes that Maeder did not seek chapter 13 relief in a manner consistent with the spirit and purpose of the bankruptcy laws. His actions demonstrate that he does not want to rehabilitate his finances through debt repayment. Rather, his sole intent in filing bankruptcy and seeking the "super discharge" afforded under chapter 13 was to avoid repaying his debt to Eternix, and only Eternix, through manipulation of the Bankruptcy Code.

The Court finds the following facts and has considered the following circumstances in reaching the conclusion that Maeder did not file chapter 13 in good faith. Each of these circumstances, on its own, may not lead to such a conclusion. But taken together, these facts and circumstances demonstrate that Maeder did not act in good faith.

### *Conversion of Non-Exempt Assets*

Before the petition date, Maeder had a brokerage account at Charles Schwab that all parties agree was not exempt.  Maeder opened the account after he sold his software company, BOSS International, to AutoDesk in 2009 or 2010.  He deposited most of the sale proceeds in the Schwab account and had an investment advisor who managed the account.

Maeder began planning to file bankruptcy in earnest in late February or early March 2025.  In the beginning of March 2025, the Charles Schwab account had a value of approximately $1.2 million.  (Ex. 210 at 1.)  During March, Maeder used almost half of the funds to repay a loan he had taken against the account to fund legal expenses in the district court litigation with Eternix.[3]  (*Id.* at 4.)  He had approximately $626,000 in the account at the end of March 2025.  (*Id.* at 2.)

In April 2025, Maeder set out to render most of the remaining funds unreachable by creditors.  On April 1, 2025, he withdrew $39,416 to pay a vehicle loan, and then claimed an exemption of $11,600 in the vehicle.  (Ex. 210 at 8; Dkt. No. 11 at 10.)

On April 9, 2025, Maeder made two withdrawals of $50,000 each, and he transferred those funds into 529 accounts for his two children.  (Ex. 210 at 9.)  On April 15, 2025, he withdrew another $50,000 that he transferred to his daughter's

---

[3] This was part of Maeder's strategy, discussed below, to repay all his creditors other than Eternix before filing bankruptcy.  However, the Court did not factor this payment into the analysis as to whether Maeder filed bankruptcy in good faith.  The parties did not present much evidence regarding the loan Maeder repaid, and unlike the other creditors Maeder paid before filing, Charles Schwab may have had setoff or other rights against the funds in Maeder's investment account.

529 account.  Maeder regularly contributed funds to his children's 529 accounts early in their lives, but he did not make any contributions after 2020.  After the transfers, his son's 529 account had a balance of $161,900.18, and his daughter's 529 account had a balance of $239,908.05.  Maeder's son expects to graduate from college in 2026; Maeder testified that his son wants to go to graduate school, but he has not applied nor been accepted to any graduate program.  Maeder's daughter expects to start college in the fall of 2026, and Maeder believes she wants to go to medical school, though that is still a long way off.  Maeder acknowledged that his children's need for the funds in their 529 accounts is uncertain, and that they may not need the amount he contributed.  He also acknowledged that he made the transfers for the express purpose of shielding the funds from Eternix.[4]

On April 10, 2025, he withdrew $70,000, which he used to pay a retainer to his personal bankruptcy counsel.  (*Id.*)  On April 11 and April 15, 2025, he withdrew a total of $290,000 that he used to purchase an annuity with Jackson National Life Insurance Company that he now claims is entirely exempt.  (*See id.*; Dkt. No. 11 at 11.)  Maeder testified that he purchased the annuity to "shore up" his retirement savings.  He also acknowledged that he wanted to shield the money from Eternix.[5] Maeder also has a Roth IRA account that had a balance of approximately $317,000 on the petition date.  (*See* Dkt. No. 11 at 6.)

---

[4] Maeder repeatedly mentioned shielding assets from his "creditors."  Maeder has only one creditor that he does not want to pay.  The only inference, then, is that Maeder wanted to shield his assets from Eternix.

[5] Maeder told the broker that he was "in a hurry to find an annuity."  (Ex. 208 at 1.)

Maeder argues that his aggressive exemption planning is perfectly allowable, and the Court should not consider it at all. The Seventh Circuit addressed exemption planning in *In re Smiley*, 864 F.2d 562 (7th Cir. 1989). In that case, the debtor used non-exempt assets to purchase real property in Kansas in an attempt to take advantage of more generous exemptions available under Kansas law. *Id.* at 563-64. Several creditors filed an action under 11 U.S.C. § 727 to deny the debtor's discharge. They asserted that the attempted conversion of non-exempt property to exempt property was a transfer made with the intent to hinder, delay, or defraud creditors under § 727(a)(2). The Seventh Circuit held that the conversion itself was not improper because "we should not prohibit a debtor's full use of exemptions within the limits of the law." *Id.* at 567. It was therefore "irrelevant" that the debtor "stood to gain a large amount of money from his creditors had his Kansas exemptions been upheld." *Id.*

More recently, a judge in the Eastern District of Wisconsin addressed a creditor's objection to a debtor's discharge based on exemption planning in *WiscTex, LLC v. Galesky (In re Galesky)*, 648 B.R. 643 (Bankr. E. D. Wis. 2022). In that case, the debtor sold non-exempt real estate and used the proceeds to purchase an exempt annuity. *Id.* at 660. Judge Halfenger applied *Smiley* to conclude that "[a] debtor's mere use of available exemptions does not evidence an intent to hinder, delay, or defraud his creditors under § 727(a)(2)." *Id.* at 661. Instead, "a court should deny a discharge under that statute, 'only where the debtor has committed some act *extrinsic* to the conversion [of property] which hinders, delays or

10

defrauds.'" *Id.* (quoting *Smiley*, 864 F.2d at 566-67) (alteration and emphasis in

original); *see also id.* ("[A] debtor should not be denied a discharge for simply

declining to pay her creditors more than the law requires.").

Maeder spends a lot of time in his briefs arguing that he did not commit the

sort of extrinsic acts that are required for a denial of discharge under *Smiley*. He

does not cite, and the Court has not found, any cases suggesting that the Court

should ignore the use of exemptions in determining whether a chapter 13 case is

filed in good faith. The inquiry under § 727(a)(2) whether the debtor transferred

property with intent to hinder, delay, or defraud creditors and the inquiry under

§ 1307(c) whether there is cause for conversion or dismissal of a chapter 13 case

based on lack of good faith are different. *Cf. Love*, 957 F.2d at 1360-61 ("We fail to

see the parallel between the specific language in Section 727(a)(4)(A), which

explicitly requires knowing and fraudulent falsification, and the broad language in

Section 1307(c), which allows dismissal 'for cause.'"). No party is yet seeking to

deny Maeder's discharge based on his exemption planning, nor is the Court

addressing the validity of the exemptions. Maeder may very well be entitled to a

chapter 7 discharge, and he may be entitled to claim exemption for all the converted

assets. Those are issues for another day. The inquiry here is whether Maeder

approached chapter 13 bankruptcy in good faith.

In deciding the pending motions, the Court must consider the totality of the

circumstances. Exemption planning on its own may not be sufficient to establish a

lack of good faith, but a debtor's exemption planning strategy is a factor that may be

11

considered in determining whether a debtor has good faith in seeking chapter 13

bankruptcy relief.  As the U.S. trustee notes, the Court cannot consider "how the

debtor's actions affected creditors," as the Seventh Circuit instructed in *Love*,

"without examining the debtor's pre-petition conversion of assets."  (Dkt. No. 107 at

1.)

Aggressive exemption planning is but one factor for the Court to consider.  In

this case, Maeder's planning shows an intent not to repay creditors through chapter

13 and instead to take advantage of the Bankruptcy Code for the purpose of

shielding assets from creditors.  If the only facts at issue related to Maeder's

exemption planning, then *Smiley* and *Galesky* may counsel against a finding that

the debtor lacked good faith.  Here, however, Maeder's aggressive exemption

planning, combined with his other actions, is evidence that he did not file chapter

13 in good faith.

### *Declination to Act as Trustee of Trust*

Maeder's mother, June Maeder, unfortunately passed away in January 2025.

She had a sizeable estate of over $10 million.  Maeder and his brother, Vincent

Maeder ("Vincent"), were her only heirs.  All or nearly all the assets in June

Maeder's estate were transferred to the June L. Maeder Survivor's Trust (the "June

Maeder Trust").  (Ex. 138.)  That trust provides for the creation of two separate

trusts upon June Maeder's death—the Christopher E. Maeder Separate Share Trust

("Maeder Separate Trust") and the Vincent A. Maeder Separate Share Trust.  (*Id.* at

12

22-25.)  Maeder is the trustee of the June Maeder Trust, and he was the default

trustee of the Maeder Separate Trust.  (*Id.* at 37; Ex. 139.)

On April 17, 2025, Maeder signed a document declining to act as trustee for

the Maeder Separate Trust.  (Ex. 213.)  According to Maeder, his declination to act

as trustee automatically made Vincent the trustee of the Maeder Separate Trust.

Maeder did not present any evidence that he sent the April 17 document to Vincent

or otherwise told Vincent at the time that he was declining to act as trustee for the

Maeder Separate Trust.  Despite his declination to act as trustee, Maeder continued

to exercise control over his trust.  On May 28, 2025, he sent an email to Vincent

detailing his plan to open a bank account for the Maeder Separate Trust, make a

distribution from the June Maeder Trust to that bank account, and then use the

funds to pay his legal bill.[6]  (Ex. 214.)  Even though he purportedly was no longer

trustee, Maeder corresponded with another bank regarding administration of a

trust bank account in late June 2025.  (Ex. 216.)  On August 8, 2025, in

correspondence regarding investment of the funds in the Maeder Separate Trust,

Maeder told his long-time investment advisor, "I must shield these funds from the

company suing me.  By having Vincent 'in charge' of my inheritance, they cannot go

after them."  (Ex. 217.)

Maeder's position in this bankruptcy is that his interest in both the June

Maeder Trust and the Maeder Separate Trust are not property of the estate because

he is no longer trustee of the Maeder Separate Trust.  (Dkt. No. 11 at 7.)  Whether

---

[6] This transaction to pay Maeder's attorneys is discussed in more detail below.

Maeder is right is an issue for another day. What is important here is that Maeder declined to act as trustee of the Maeder Separate Trust for the express purpose of shielding the assets in that trust from Eternix. Despite signing the declination on April 17, he did not provide it to Vincent. Maeder also continued to act on behalf of the trust, directing a distribution to pay his legal bills while taking the position that the assets in the trust could not be used to pay his other debts, including the debt to Eternix.

### *Payment of All Other Creditors*

Eternix is Maeder's only creditor, and he specifically engineered this bankruptcy so that he would have just one creditor. He purposefully paid all his other debts before filing. The parties did not present evidence regarding Maeder's payment of typical utility and other such expenses such as cell phone, internet, electricity, and the like, but it is undisputed that Maeder had no such creditors on the petition date, suggesting that he purposefully paid all these bills before filing.

The parties presented evidence regarding three creditors that warrants discussion. First, Maeder owns a 2023 Tesla Model X. At least as of the beginning of April 2025, the vehicle was titled in the name of both Maeder and CivilGEO (it is unclear how the vehicle is currently titled) and the vehicle was encumbered by a loan. It is unclear whether the borrower on the loan was Maeder or CivilGEO or both. On April 1, 2025, the same day that Maeder caused CivilGEO to file bankruptcy, Maeder withdrew $39,416 from his non-exempt investment account at Charles Schwab. (Ex. 210 at 8.) He used those funds to pay off the loan on the

14

vehicle on April 1, 2025.  (Ex. 219 at 31.)  Maeder made the payment with the express intent that the vehicle would be unencumbered by a loan when he filed a personal bankruptcy.

Second, Maeder used a Bank of America credit card for many of his day-to-day expenses such as food and clothing.  In preparation for his bankruptcy filing, Maeder made payments to Bank of America of $15,000 on July 16, 2025 and $4,000 on July 28, 2025.  (Ex. 227 at 3.)  Maeder testified that he wanted to be sure that he was not carrying a balance on the card when he filed bankruptcy.  By the petition date at the end of August 2025, the balance on the card was negative by $7,615.77.  (*See* Dkt. No. 63 at 6.)  Bank of America closed the account and Maeder received a refund of this amount after he filed bankruptcy.  Maeder did not disclose the prepayment as an asset on his schedules until December 15, 2025, more than three months after the petition date.  He attributes his failure to disclose the asset to an innocent mistake and miscommunication with his counsel.  The Court does not find Maeder's explanation to be credible.  His failure to disclose the asset is part of a larger pattern of nonchalance toward his disclosure obligations as a debtor and is one circumstance suggesting that he did not approach the filing in good faith.

Third, Maeder ensured that his lawyers were paid in full before he filed bankruptcy.  Maeder and CivilGEO were represented by the law firm of Michael Best & Friedrich LLP in the district court litigation filed by Eternix.  Maeder and CivilGEO incurred substantial legal fees in defending the lawsuit.  Maeder withdrew several hundred thousand dollars from his Charles Schwab account to

fund the litigation, but by the time CivilGEO was planning to file bankruptcy, Maeder and CivilGEO still owed over $400,000 in legal fees.

Michael Best, Maeder, and the Maeder Separate Trust entered into an Agreement to Distribute Funds that would allow Michael Best's fees to be paid. (Ex. 301.) The parties to the agreement acknowledged that both Maeder and CivilGEO were responsible for the fees, but that Maeder, on behalf of CivilGEO, wanted to engage Michael Best for CivilGEO's bankruptcy filing and Michael Best would be disqualified from representing CivilGEO if the firm held such a sizeable claim for unpaid fees against CivilGEO. The parties agreed that Michael Best would waive its claim against CivilGEO in exchange for the agreement of Maeder and the Maeder Separate Trust that Michael Best's fees would be paid from the trust. (*Id.*)

It is unclear when the agreement was signed. The first page indicates that it is dated as of February 25, 2025. The document has a footer that includes a date of March 14, 2025. The document likely was signed by April 9, 2025, because an attorney with Michael Best submitted a declaration in CivilGEO's bankruptcy case stating that the Maeder Separate Trust had already agreed to pay the fees from the district court litigation and that the firm had waived its claims against both CivilGEO and Maeder. *See* Declaration of Justin M. Mertz, *In re CivilGEO, Inc.*, Case No. 25-10731, Dkt. No. 26-1 (Bankr. W.D. Wis.). Vincent signed as trustee of the Maeder Separate Trust; however, Maeder did not sign the document declining to act as trustee of the Maeder Separate Trust until April 17, 2025, and Maeder

16

agreed that Vincent did not become trustee of the Maeder Separate Trust until he signed the declination. (*See* Dkt. No. 100 ¶ 5.)

On May 28, 2025, Maeder sent an email to Vincent explaining that he was planning to set up bank accounts for the two separate share trusts so that he could make a distribution from the June Maeder Trust to the Maeder Separate Trust. (Ex. 214.) He said, "Michael Best is wanting their payment, so that is why I am moving on this." (*Id.* at 1.) He also said, "You will be trustee of my trust account. In that way, the company that is suing me is unable to compel me to provide them access to these funds[.]" (*Id.*)

Maeder filed bankruptcy on August 29, 2025, 93 days after sending that email. The timing strongly suggests that Maeder waited until the 90-day preference period under 11 U.S.C. § 547(b)(4)(A) had passed.[7] It seems Maeder wanted to ensure that all his creditors other than Eternix were paid in full and experienced no negative consequences of his bankruptcy.

Courts considering a chapter 13 debtor's good faith under § 1307(c) often conclude that negative impacts on a single creditor are indicative of a lack of good

---

[7] The record does not include information as to when the payment was actually made to or received by Michael Best. It's possible the payment was made fewer than 90 days before the petition date. Part of the problem is that Maeder did not disclose the payment to Michael Best on his Statement of Financial Affairs. Even if the trust res or corpus of the Maeder Separate Trust cannot be reached by creditors (again, the Court is not deciding that issue today), the distributions made to Maeder as the sole beneficiary or for his benefit may be subject to creditor claims. *See* Wis. Stat. § 701.0502(3) (a creditor may not reach a beneficiary's interest in a spendthrift trust before "receipt by the beneficiary"); *see also, e.g.*, *Birdsell v. Coumbe (In re Coumbe)*, 304 B.R. 378, 386 (B.A.P. 9th Cir. 2003) (holding that certain distributions from spendthrift trusts are property of the bankruptcy estate). The trust's agreement to pay the Michael Best bill was for Maeder's benefit; Michael Best's agreement to waive its claim against Maeder individually conferred a significant financial benefit to Maeder; and Maeder's orchestration of the payment benefited CivilGEO, which is an insider. It is unclear why Maeder did not disclose the transaction.

17

faith.  In *Love*, the Seventh Circuit noted that "the bankruptcy proceedings will

have a negative impact on only one creditor, the IRS," which "indicates a degree of

unfairness to the IRS." *Love*, 957 F.2d at 1359.  Many other courts have concluded

that a debtor lacked good faith in filing his petition where the debtor sought

bankruptcy to evade a single creditor.  *See, e.g.*, *McGovern*, 297 B.R. at 661 (when

determining if the bankruptcy was for the purpose of avoiding a single creditor,

"[t]he pertinent question" is "whether [the debtor] is intent on repaying [the

creditor] as much as possible in a genuine effort at rehabilitation, or as little as

possible in an effort to thwart and avoid a legitimate debt"); *In re Farber*, 355 B.R.

362, 368 (Bankr. S.D. Fla. 2006) (debtors lacked good faith because they had

sufficient assets to pay all but one unsecured creditor in full and bankruptcy was

filed for the sole purpose of evading a single creditor); *Banks v. Vandiver (In re

Banks),* 248 B.R. 799, 804-05 (B.A.P. 8th Cir. 2000) ("[T]he Debtor's admitted

motivation for seeking chapter 13 relief suggests that his modified plan was

proposed not with the intention of satisfying Vandiver's claim to the greatest extent

possible, but with the intention of *avoiding* payment of that claim to the greatest

extent possible[.]"), *aff'd*, 267 F.3d 875 (8th Cir. 2001); *In re Baird,* 234 B.R. 546

(Bankr. M.D. Fla. 1999) (chapter 13 plan was not filed in good faith where the

debtor was apparently using chapter 13 to discharge a judgment debt that likely

would have been excepted from chapter 7 discharge); *In re Herndon*, 218 B.R. 821,

825 (Bankr. E.D. Va. 1998) ("The debtor's proposed 36 month chapter 13 plan will

18

pay a relatively small six percent of the embezzlement claim.  Such a nominal payment on a potentially nondischargeable claim is evidence of bad faith.").

The Court concludes that the steps Maeder took to ensure Eternix would be the only creditor affected by his bankruptcy demonstrates a lack of good faith. Maeder did not enter bankruptcy to deal fairly with all his creditors.  He paid all his creditors so that he could unfairly treat Eternix by paying a fraction of its claim while all other creditors, including Maeder's attorneys, had their claims paid in full.

### *Dischargeability of Debt to Eternix*

The Seventh Circuit instructed in *Love* that one factor courts should consider in determining whether a chapter 13 debtor filed his petition in good faith is the nature of the debt and whether it would be nondischargeable in a chapter 7 case. 957 F.2d at 1357.  A chapter 7 discharge excepts, among others, debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  A chapter 13 discharge, often referred to as a "super discharge," includes debts that would otherwise be excepted from discharge under § 523(a)(6).  *See* 11 U.S.C. § 1328(a)(2).  Debts incurred for copyright infringement may be excepted from discharge under § 523(a)(6).  *Star's Edge, Inc. v. Braun (In re Braun)*, 327 B.R. 447 (Bankr. N.D. Cal. 2005) (determining that debt for copyright infringement was nondischargeable under § 523(a)(6)); *see also Ocean Innovations, Inc. v. Ahern (In re Ahern)*, 541 B.R. 438, 447 (Bankr. W.D. Wis. 2015) (determining that debt for patent infringement was nondischargeable under § 523(a)(6)).

19

"That a debt would be nondischargeable under Chapter 7 . . . is not alone sufficient as a matter of law to constitute bad faith." *In re Smith*, 848 F.2d 813, 818 (7th Cir. 1988); *see also id.* ("Although the debtor's motive in invoking Chapter 13 solely to obtain discharge of a . . . non-dischargeable debt, as well as the circumstances under which that debt arose, may be factors to consider as part of the totality of the circumstances, they cannot, as a matter of law, suffice to show bad faith.") (quoting *In re Chaffin*, 816 F.2d 1070, 1074 (5th Cir. 1987)).  But a chapter 13 case "is not properly used for the sole purpose of discharging an otherwise nondischargeable debt." *In re Schaitz*, 913 F.2d 452, 455 (7th Cir. 1990).  In *Love*, the debtor filed a chapter 13 case to avoid paying a tax debt to the IRS, and the Seventh Circuit held that "filing a Chapter 13 petition in order to thwart the payment of an otherwise nondischargeable income tax debt arising from the unlawful failure to pay income taxes was not one of the intended purposes of the bankruptcy provisions." 957 F.2d at 1359.  The debtor's attempt to thwart a single creditor whose debt was otherwise nondischargeable was one factor in the totality of the circumstances indicating the debtor's bad faith.  *Id.*

Here, Eternix filed an adversary complaint alleging that the debt for copyright infringement is nondischargeable under § 523(a)(6).  The evidence strongly suggests that Maeder chose a chapter 13 bankruptcy over a chapter 7 or chapter 11 to take advantage of the "super discharge" and avoid any portion of the debt that could be declared non-dischargeable under § 523(a)(6).  The Court will not pre-judge that adversary proceeding, and the potential nondischargeability of

20

Maeder's debt to Eternix is not, on its own, enough for the Court to conclude that Maeder did not file bankruptcy in good faith. It is, however, part of a larger set of circumstances demonstrating that the goal, purpose, and intent of this bankruptcy was to treat Eternix unfairly. Not only is the debt potentially nondischargeable, it is the only debt that Maeder seeks to avoid.

### *Non-Disclosure of Gifts*

Despite knowing that he was planning to file bankruptcy, Maeder spent thousands of dollars on gifts for his girlfriend, his children, and his ex-wife, including clothing, jewelry, and concert tickets. These expenditures are part of the pattern of activity suggesting that Maeder did not approach chapter 13 in good faith.

Two gifts in particular are indicative of Maeder's lack of good faith. Question 13 on the Statement of Financial Affairs asks, "Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?" Maeder answered, "No." (Dkt. No. 63 at 18.) This was not accurate.

First, on July 16, 2025, Maeder sent a check in the amount of $10,000 to his ex-wife, Tamara Dudiak. (Ex. 226.) Maeder testified that he gave Dudiak the money to help her pay for renovations and repairs to her house. Maeder should have disclosed this gift on Question 13 of the Statement of Financial Affairs. He did not.

Maeder testified that he "forgot" about the payment to Dudiak. He did disclose various payments made to her for child support in response to Question 7,

21

which asks about payments to insiders for debts owed.  (*See* Dkt. No. 63 at 17.)  He

says he compiled the list by reviewing his physical check register, and that he

missed the $10,000 payment because he sent it using his bank's online check

payment tool.  The Court finds that this testimony is not credible.  Maeder's

testimony was clear that he wanted to help Dudiak repair her house, which is not a

child support payment that would have been included in response to Question 7.

Moreover, one generally does not "forget" about a $10,000 payment to one's ex-

spouse made just six weeks before filing bankruptcy.  Maeder's apparent failure to

conduct a basic review of his bank statements to ensure that all payments were

included on his Statement of Financial Affairs is indicative of his lackadaisical

approach to filling out his bankruptcy schedules.  And his failure to provide

complete and accurate information in documents that he swore were accurate under

penalty of perjury is evidence of his lack of good faith.

Second, while on a business trip in India in July 2025, Maeder made three

purchases at Chanel in the amounts of $201.81, $487.47, and $494.44.  (Ex. 227 at

3.)  Maeder testified that these purchases were gifts for his girlfriend.  Maeder

should have disclosed these gifts on Question 13 of the Statement of Financial

Affairs.  He did not.  He offered no explanation for his failure to disclose these gifts,

which again demonstrates his reckless approach to compliance with his obligations

under the Bankruptcy Code and is further evidence of his lack of good faith.

22

### *Manipulation of Bankruptcy Schedules*

Finally, Maeder engaged in severe manipulation of the numbers on his bankruptcy forms. He made his expenses as high as possible, and the proposed payments to the chapter 13 trustee as low as possible. Such manipulation "may be relevant when determining if the entire proceedings were initiated in good faith." *Love*, 957 F.2d at 1360. Four figures in Maeder's schedules and plan warrant discussion.

First, Maeder assigned a value of $0 to his interest in CivilGEO. (Dkt. No. 63 at 5.) Maeder valued the company himself and says he based his value on what he thinks a buyer might pay for the company. His sole rationale for the $0 value is the fact that CivilGEO is presently in bankruptcy and is itself facing a large claim by Eternix, so it is unlikely that someone would buy it.

Maeder told a different story outside bankruptcy court. Maeder keeps a running chart of all the people and companies that have contacted him expressing interest in purchasing CivilGEO. In a series of emails to his brother and his ex-wife, Maeder forwarded updated versions of this chart and gave his opinion on the value of CivilGEO. On March 3, 2025, after he was already contemplating bankruptcy for CivilGEO and himself, Maeder sent the chart to Vincent and Dudiak saying, "In case something happens to me, I have documented how to get CivilGEO sold." (Ex. 203.) He said that he had been approached in the past to sell the company for $20 million, that "a software company's purchase price is 4 to 7 times

23

annual recurring revenue," and that CivilGEO's annual revenue is $4.5 million.

(*Id.*)

On June 13, 2025, after CivilGEO had been in bankruptcy for more than two months, Maeder sent Vincent and Dudiak "updated acquisition information for CivilGEO." (Ex. 215.)  On September 1, 2025, Maeder sent an email forwarding information regarding the potential value of CivilGEO "in case I get hit by a bus." (Ex. 225.)  The information attached to his email indicated that the company was worth $12 million to $16 million, but Maeder said in his email, "Actually, valuation should be closer to $20M+, as the inputs into the calculator only went up so far." (*Id.*)  Maeder testified that he was simply boasting, and that his emails are not indicative of the value of CivilGEO.

The Court finds that Maeder's testimony is not credible.  Maeder clearly believed that his company had significant value before the bankruptcy, and he continued to communicate that belief after bankruptcy.  He even testified that he would not sell his interest for $0.  (Dkt. No. 100 ¶ 17.)

Maeder's apparently incorrect valuation of CivilGEO is significant.  Pursuant to 11 U.S.C. § 1325(a)(4), a chapter 13 debtor must pay his unsecured creditors through the chapter 13 plan at least as much as the creditors would receive in a chapter 7 case.  The lower the value of his assets, the less Maeder has to pay Eternix.  If CivilGEO is really worth $20 million as Maeder told his family, then Maeder would need to pay at least that much to Eternix.

24

Second, Maeder initially included a monthly child support expense of

$2,695.08 on line 18 of Schedule J and a monthly child support expense of $2,690.38

on line 19 of Form 122C-2.  (Dkt. No. 11 at 22; Dkt. No. 12 at 8.)  Maeder does pay

child support to Dudiak each month for his minor daughter pursuant to a court

order, and the amount is variable based on his daughter's needs.  Maeder said that

he reimburses Dudiak for some expenses and that he pays other expenses directly.

The monthly payments he made to Dudiak for reimbursement of expenses before

filing are nowhere near the amount he claims as child support.  (*See* Dkt. No. 11 at

35.)  Maeder could not say how he calculated the child support figures on his initial

schedules.[8]

Maeder later amended his schedules to adjust the child support expense to

$1,647.62 on both Schedule J and Form 122C-2.  (Dkt. No. 63 at 13, 33.)  Maeder's

Schedule J now also includes a monthly expense of $886.52 for "daughter's food,

clothing, education, and personal care" to account for the expenses he funds

directly.  (*Id.* at 13.)

Maeder's inflation of the child support figure is significant because it affected

the bottom-line figure on Form 122C-2.  That form is intended to assist unsecured

creditors and the chapter 13 trustee in ensuring that the requirements of 11 U.S.C.

§ 1325(b) are satisfied.  The bottom-line figure generally is the minimum required

---

[8] The U.S. trustee argues that the inflated number was derived in part based on concert tickets that Maeder purchased for his daughter in the months before filing bankruptcy and included as child support.  Maeder testified that he could not recall whether the concert tickets were included in the figure, but his briefs suggest that he did include the cost of expensive concert tickets in estimating his child support obligations.  (Dkt. No. 66 at 6.)

distribution to unsecured creditors for over-median income debtors like Maeder. Maeder's unwarranted and unsupported adjustment of the child support figure resulted in a higher required distribution to unsecured creditors—i.e., Eternix.

Third, on his initial Schedule J Maeder included a monthly medical expense of $1,580 and monthly expense to support his college-age son of $958.75. (Dkt. No. 11 at 22.) On his initial Form 122C-2, Maeder included a monthly medical expense of $2,262.58. (Dkt. No. 12 at 8.) Maeder later amended Schedule J to reduce the monthly medical expense to $113.74 and remove the monthly support payment for his son. (Dkt. No. 63 at 13.) Maeder's latest amended Form 122C-2 includes no additional medical expense deduction. (*Id.* at 33.)

As with the inflated child-support figure, Maeder's inflation of his monthly medical expenses reduced the bottom-line figure on Form 122C-2, resulting in a lower required payment to Eternix. Maeder offered no explanation for his inclusion of such a significant monthly medical expense on his initial Form 122C-2, but the monthly figure appears to be based on a one-time expense of $2,000 for his adult son. (*See* Dkt. No. 6 at 6; Dkt. No. 59-3.) Maeder's estimate that his medical expenses exceed $2,000 every month based on a single expense was unreasonable and demonstrates a lack of good faith.

Fourth, Maeder's initial chapter 13 plan proposed that he pay just $50 per month for 22 months, until he no longer had a child support obligation for his daughter. (Dkt. No. 14.) After that, he would pay $1,350 for 37 months, and he would conclude the plan with a lump sum payment of $35,821.60. (*Id.*) The total

26

plan payments equaled $86,871.60, almost precisely the amount of his undervalued

non-exempt assets, which is what the creditors would receive in a chapter 7 case.

This amount did not account for Maeder's pre-petition gifts to Dudiak or his

girlfriend, nor did it account for potentially preferential transfers or the disposable

income he would have but for his inflated expenses on Form 122C-2.  Maeder

eventually amended his proposed chapter 13 plan to provide for payments of $4,305

per month until he no longer has to pay child support, and $5,950 per month

thereafter.  (Dkt. No. 64.)

All this indicates that Maeder attempted to manipulate the Bankruptcy Code

and required forms to ensure that he paid only a small fraction of Eternix's claim.

Maeder did not, as he was required to do, take stock of his finances and ensure that

the numbers he reported on Form 122C-2 reflected his actual monthly expenses and

were appropriately characterized.  Rather, he provided numbers, under penalty of

perjury, that had little or no basis in fact.

Maeder dismisses these issues as refining amendments of the sort made in

many, if not most, chapter 13 cases, and he argues that "complex cases routinely

require some schedule amendments." (Dkt. No. 113 at 6.)  He points to his

voluminous document productions and candor in disclosing his financial

information in discovery.  Maeder is right that many chapter 13 debtors amend

their schedules, their Form 122C-2, and their chapter 13 plan—sometimes several

times—before the chapter 13 trustee, the creditors, and the court are satisfied with

the numbers.  The need for those amendments may or may not be indicative of a

27

debtor's lack of good faith.  As the Seventh Circuit said, courts are to examine the debtor's good faith on a case-by-case basis.

The complexity of this case was occasioned by Maeder's own conduct in transferring assets, improperly accounting for his child support and medical expenses, and failing to disclose certain prepetition transfers.  The inaccuracies of the figures in Maeder's schedules did not result from mere inadvertence or mistake because this is a complex case.  Rather, the evidence suggests that Maeder recklessly, or perhaps even intentionally, provided inaccurate and incomplete information at the outset of the case.  "In some instances, reckless behavior is enough to support a finding of bad faith." *Killian v. Germeraad (In re Killian)*, 529 B.R. 257, 265 (C.D. Ill. 2013) (citing *In re Yonikus,* 974 F.2d 901, 905 (7th Cir. 1992)).

Standing alone, Maeder's amendments to his schedules may not necessarily lead to a finding that Maeder lacked good faith in filing his chapter 13 plan. However, when the amendments are considered together with his aggressive pre-bankruptcy exemption planning,[9] his payment of all creditors except Eternix, and his non-disclosure of gifts, it starts to look a lot like Maeder viewed his initial schedules and chapter 13 plan as something of an opening offer to be negotiated. That is not indicative of a debtor's good faith.  When filing chapter 13, a debtor

---

[9] The care Maeder took in his pre-bankruptcy planning is further evidence of his intent in filing his initial schedules.  Maeder methodically placed or attempted to place significant assets out of the reach of this creditor, but he now claims that the inaccurate and inappropriate figures on his bankruptcy schedules are mere mistakes.  That claim simply is not credible.

must propose a chapter 13 plan that complies with the requirements of the Bankruptcy Code and represents the debtor's good faith effort at repayment.

Maeder's post-petition conduct affirms that he did not seriously intend to make a good-faith effort to pay his creditors. On November 26, 2025, Maeder traded emails with his investment advisors regarding the IRA contribution limit, which was $8,000 in 2025 for those age 50 or older. (Ex. 232.) Maeder instructed his investment advisor to "maximize this" because "I have funds available for this." (*Id.*) Maeder said he was referring to the funds in his bank accounts and in the Schwab account; all except $5,000 of those funds was not exempt. (*See* Schedule C, Dkt. No. 11 at 10-11.) That is, Maeder wanted to use $8,000 in non-exempt funds that are still property of the bankruptcy estate and convert them to exempt funds, potentially placing them out of the reach of creditors. Maeder did not make a contribution to his IRA at that point, but the fact that Maeder gave such an instruction to his investment advisor without considering the consequences for his bankruptcy case indicates that he is not taking his responsibilities as a bankruptcy debtor seriously.

* * *

It is possible that any of the above facts on its own would not be sufficient to conclude that Maeder lacked good faith when he filed his chapter 13 petition. When considered together, however, they indicate that Maeder did not seek chapter 13 relief in good faith. Each of the factors that the Seventh Circuit identified in *Love* weighs in favor of this finding.

29

The only debt that Maeder seeks to discharge is the result of his copyright infringement.  The infringing code allowed Maeder to build a business that he says is worth in excess of $20 million.  Eternix has alleged the debt is nondischargeable under § 523(a)(6), and Maeder filed chapter 13 solely to take advantage of the "super discharge" that includes debts that would otherwise be nondischargeable in a chapter 7.

Maeder began preparations to file bankruptcy within weeks after his mother died and he stood to inherit millions.  He filed only after he attempted to render his inheritance unreachable by creditors, after he converted hundreds of thousands of dollars in non-exempt assets to exempt assets, and after he paid every creditor in full other than Eternix.  Maeder also waited 90 days after instructing payment to his second largest creditor, Michael Best, which appears to be an attempt to shield that creditor from preference liability.  In short, Maeder took deliberate steps to ensure that Eternix would be the only creditor harmed by the bankruptcy.

Maeder's singular motive in filing a chapter 13 petition was to avoid paying Eternix.  He intentionally manipulated his bankruptcy schedules to ensure that he would pay as little as possible to Eternix.  The manipulation included claimed expenses with no basis in fact, omission of significant gifts to his ex-wife and girlfriend, and valuation of CivilGEO inconsistent with Maeder's own statements.

Based on the totality of the circumstances, the Court concludes that "cause" exists to dismiss or convert under 11 U.S.C. § 1307(c) because Maeder did not file this chapter 13 case in good faith.

30

**II.**

Having determined that there is "cause" to convert or dismiss this case based on Maeder's lack of good faith, the Court must consider whether the case should be converted or dismissed. The statute instructs that a court should determine which course "is in the best interests of creditors and the estate." 11 U.S.C. § 1307(c). The decision to convert or to dismiss a chapter 13 case is a matter of discretion for the bankruptcy court and "should be made on a case-by-case basis considering the best interest of creditors and the bankruptcy estate." *In re Fishel*, 583 B.R. 474, 478 (Bankr. W.D. Wis. 2018) (citing *In re Handy*, 557 B.R. 625, 628 (Bankr. N.D. Ill. 2016), and *In re Cutillo*, 181 B.R. 13, 14 (Bankr. N.D.N.Y. 1995)).

Eternix[10] and the U.S. trustee favor conversion of the case to chapter 7. Some courts have considered creditor support in ordering conversion rather than dismissal. *See, e.g.*, *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 799 (E.D. Pa. 2000) (affirming conversion of chapter 11 case in part because "all creditors present at the hearing, as well as the UST, favored conversion over dismissal"). However, the Court must make its own determination even when there is creditor support for conversion. *See In re Brown*, 671 B.R. 461, 474 (Bankr. D. Md. 2025).

Dismissal is appropriate when the debtor's primary creditor is well-positioned to protect its interests outside of bankruptcy and there are few unencumbered assets for a chapter 7 trustee to pursue. *See In re Helmers*, 361 B.R.

---

[10] Eternix initially sought dismissal of the case (*see* Dkt. No. 29), but it now seeks conversion rather than dismissal (*see* Dkt. No. 109).

190, 198 (Bankr. D. Kan. 2007) (noting that the IRS had a lien on most of the debtors' assets that would leave little for the chapter 7 trustee to recover for unsecured creditors). Where there are assets available, a chapter 7 trustee can investigate the debtor's financial affairs and pursue possible fraudulent or preferential transfers for the benefit of unsecured creditors. *In re Stoller*, 351 B.R. 605, 625 (Bankr. N.D. Ill. 2006).

This case involves a single creditor, which may weigh in favor of dismissal. One benefit of chapter 7 is that creditors are saved from the "race to the courthouse" to recover a debtor's non-exempt assets, and those assets can be distributed fairly among all creditors. In this bankruptcy all distributions from the chapter 7 estate would go to Eternix. And outside of bankruptcy Eternix is not racing any other creditor to reach Maeder's assets, so there will be no issues of fairness based on which creditor gets to an asset first.

Many other factors weigh in favor of conversion. Eternix cannot execute on Maeder's non-exempt assets until it has a judgment. Maeder significantly stalled the district court litigation by putting CivilGEO and himself in bankruptcy, so it will be many months or years before Eternix is able to proceed with collection. By then, Maeder may have dissipated more of his assets or converted them to exempt assets out of the reach of creditors. In bankruptcy, a chapter 7 trustee can fully investigate Maeder's financial affairs and recover assets like preferential or fraudulent transfers that Eternix may not be able to recover outside of bankruptcy. Maeder argues that these assets have little value, and that he would pay Eternix

more under a chapter 13 plan than a chapter 7 trustee could recover. (Dkt. No. 113 at 9-10.) Maeder's focus on the allegedly preferential or fraudulent transfers ignores his other non-exempt assets, including his bank accounts, his Charles Schwab account, and his vehicle. Moreover, the question is not whether Eternix is better off in chapter 13 or chapter 7. Having found cause under § 1307(c), the question is whether Eternix, as the only creditor, is better off in chapter 7 or outside bankruptcy. Eternix says it will fare better in chapter 7, and the Court agrees that there are assets for a chapter 7 trustee to pursue that Eternix may not be able to reach outside bankruptcy. A chapter 7 trustee is also better positioned to object to Maeder's exemptions, if warranted, and to seek recovery of Maeder's interest in the June Maeder Trust and the Maeder Separate Trust if either turns out to be property of the bankruptcy estate.[11]

Maeder asks the Court to stay any order converting the case to allow him to voluntarily dismiss under § 1307(b) if the Court finds that he did not file chapter 13 in good faith. (Dkt. No. 94 at 13.) Some courts have held that a debtor retains the absolute right to seek dismissal under § 1307(b) even when the bankruptcy court finds that the debtor abused the bankruptcy process. *See Nichols v. Marana Stockyard & Livestock Mkt., Inc. (In re Nichols)*, 10 F.4th 956, 964 (9th Cir. 2021). In *Nichols*, the bankruptcy court found cause to convert the case to chapter 7, but

---

[11] The U.S. trustee and Eternix also argue that a chapter 7 trustee can collect from Maeder's ownership interest in CivilGEO if it has any value, which they say would be a complicated, if not impossible, endeavor for Eternix outside bankruptcy. Maeder notes that the likely buyer of his interest in CivilGEO is Eternix, and that such a transaction would "amount to a zero-sum transaction" since Eternix is the only creditor. (Dkt. No. 113 at 8.) Maeder may be right, but his shares in CivilGEO are just one asset that a chapter 7 trustee can pursue.

stayed its conversion order for 30 days. *Id.* at 959. During that period, the debtor filed a motion under § 1307(b). *Id.* The Ninth Circuit allowed the dismissal, but noted that immediate conversion of the case may have foreclosed the debtor's ability to dismiss. *Id.* at 964 ("[A]n order granting a creditor's motion to convert under § 1307(c) would foreclose dismissal under § 1307(b).") (quotation omitted). Other courts have likewise concluded that a debtor loses his right to dismissal under § 1307(b) after conversion under § 1307(c). *See, e.g.*, *Pino v. Martinez (In re Pino)*, 657 B.R. 264, 271 (B.A.P. 10th Cir. 2024).

Maeder wants to roll the dice on the motions to convert while also retaining his right to dismiss the case if he loses the bet. That is not an appropriate use of the bankruptcy process. Maeder can elect to be in bankruptcy, with its attendant benefits and obligations, or he can dismiss the case. He cannot do both. Maeder voluntarily came to bankruptcy court and voluntarily chose to litigate the motions to convert rather than seek dismissal under § 1307(b). Section 1307(c) instructs that the Court should consider whether dismissal or conversion is in the best interests of creditors and the estate; it does not say anything about the interests of the debtor. The Court will not reward Maeder with dismissal after finding that he lacked good faith in filing his petition.

For the same reason, the Court will not defer consideration of Maeder's good faith in filing the petition until confirmation as Maeder suggests. (*See* Dkt. No. 113 at 7-8.) As long as this case remains in chapter 13, Maeder may have an absolute right to dismiss under § 1307(b).

34

Moreover, the movant's burden to prove lack of good faith under § 1307(c) is higher than the debtor's burden to prove good faith at plan confirmation under § 1325(a). *See Love*, 957 F.2d at 1356 ("Because dismissal is harsh we agree that the bankruptcy court should be more reluctant to dismiss a petition under Section 1307(c) for lack of good faith than to reject a plan for lack of good faith under Section 1325(a)."). To confirm a chapter 13 plan, the Court must find that "the action of the debtor in filing the petition was in good faith." 11 U.S.C. § 1325(a)(7). The Court has already concluded that Maeder did not file the petition in good faith under the higher standard. Therefore, it will be impossible for the Court to make the finding under § 1325(a)(7) required to confirm a chapter 13 plan.

## CONCLUSION

Maeder did not file chapter 13 in good faith. He did so to avoid a single creditor that has argued its debt is nondischargeable in a chapter 7 case. Not only was Maeder trying to avoid that debt, but he singled out Eternix for adverse treatment; all Maeder's other creditors were paid in full. Moreover, Maeder recklessly or intentionally failed to disclose gifts and other transactions, and he recklessly or intentionally manipulated numbers on his bankruptcy schedules to ensure that Eternix would recover as little as possible. The purpose of chapter 13 is repayment of debt, not avoidance of debt. Maeder's filing was not "fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions." *Love*, 957 F.2d at 1357. Therefore, there is cause for dismissal or conversion of this case pursuant to 11 U.S.C. § 1307(c). The bankruptcy estate and the estate's only

35

creditor will benefit from conversion, rather dismissal, so the Court will order that

this case be converted to one under chapter 7.

### ORDER

For the foregoing reasons, IT IS HEREBY ORDERED:

1.      Eternix Ltd.'s motion to dismiss or convert pursuant to 11 U.S.C.

§ 1307(c) (Dkt. No. 29) is GRANTED.

2.      The United States trustee's motion to dismiss or convert pursuant to

11 U.S.C. § 1307(c) (Dkt. No. 58) is GRANTED.

3.      The Clerk shall convert this case to chapter 7, effective immediately.

# # # # #